[No. B121492. Second Dist., Div. Seven. Sept. 20, 1999.]

GREAT WESTERN CASINOS, INC., Plaintiff and Appellant, v. MORONGO BAND OF MISSION INDIANS et al., Defendants and Respondents.

1408

1410

## COUNSEL

Benedon & Serlin, Douglas Benedon, Gerald M. Serlin; Richard Sherman; and Robert E. Young for Plaintiff and Appellant.

Alexander & Karshmer, Barbara E. Karshmer and John R. Shordike for Defendants and Respondents Morongo Band of Mission Indians, Tribal Council of Morongo Band of Mission Indians and individual tribe members.

Frampton, Williams & Little, Mary Louise Frampton and Scott W. Williams, for Defendants and Respondents Alexander & Karshmer and Barbara E. Karshmer, Inc.

## OPINION

**JOHNSON, J.**—Plaintiff and appellant, Great Western Casinos, Inc. (GWC) is the successor in interest to the Morongo Band of Mission Indians' gaming manager, EC Investments, Inc. GWC filed this action against defendants and

respondents the Morongo Band of Mission Indians, its tribal council, the individual tribal council members, numerous individual tribal members, counsel for the Morongo Band, the law partnership of Alexander & Karshmer, and Barbara Karshmer, Inc., a member of Alexander & Karshmer. GWC's complaint alleged claims for bad faith breach of contract, fraud, breach of fiduciary duty, constructive fraud, conversion, interference with business relations, abuse of process, civil violation of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1961 et seq. (RICO)), money had and received, imposition of a constructive trust, accounting and dissolution of partnership.

The trial court granted the defendants' motion to quash and dismissed the action. The trial court found GWC's action was barred by the separate and independent grounds of federal preemption and sovereign immunity. We affirm.

FACTS AND PROCEEDINGS BELOW

The Morongo Band of Mission Indians (Morongo Band or tribe) is a federally recognized Indian tribe with a governing body duly recognized by the Secretary of the Interior. (See *California* v. *Cabazon Band of Mission Indians* (1987) 480 U.S. 202, 204 [107 S.Ct. 1083, 1085-1086, 94 L.Ed.2d 244].) The Morongo Indian Reservation is located in Riverside County.

Toward the end of 1991 the Morongo Band wished to expand the gaming enterprise on its reservation. In March 1992, E.C. Investments, Inc. (ECI) and the Morongo Band entered into a written management agreement. ECI/GWC was to develop, operate and maintain a gambling enterprise on the Morongo Band Reservation known as Casino Morongo. ECI/GWC agreed to contribute at least $5 million toward business, construction and operating costs. The parties agreed ECI/GWC was to recover this initial investment of $5 million in the form of a management fee, namely 30 percent of the profits earned by the gaming and nongaming operations conducted at the gaming facility Casino Morongo.

The management agreement specified the tribal council had ultimate authority and responsibility for overseeing business operations of the casino and that no individual tribal member had authority to act on behalf of the gaming enterprise without tribal authorization.

Under the terms of the management agreement ECI/GWC undertook to manage the casino operations for a period of five years. The agreement also specified the conditions under which the management agreement could be

terminated with cause[1] or without cause. In the event the tribe terminated the agreement "wrongfully, in bad faith, and without cause" ECI/GWC was only entitled to recover its presumed initial investment of $5 million. In the event the tribe terminated the contract prior to ECI/GWC recovering its presumed initial investment, then ECI/GWC had the right to request arbitration. Specifically, the clause of the contract regarding termination without cause provides: "20.2 Termination without Cause by Owner. If the Owner terminates this Agreement wrongfully, in bad faith, and without cause, Manager shall have only those rights set forth herein in Article 21 to recover its initial investment of not more than Five Million Dollars ($5,000,000) and shall have no further right to the use or occupancy of the premises."

Article 21 of the management agreement specifies ECI/GWC's rights in the event the tribe terminates the contract without cause and in bad faith. This article further specifies the extent to which the tribe agreed to waive its sovereign immunity and the conditions under which it consented to suit.

Section 21.1 grants to ECI/GWC the right to request arbitration in the event it has not recovered its initial investment at the time of the tribe's bad faith breach. This clause provides: "If the Owner wrongfully terminates this Agreement in bad faith and without cause prior to the Manager having recovered its initial investment in an amount not to exceed Five Million Dollars ($5,000,000), the Manager may call for non-binding arbitration" but only after informal efforts to resolve the situation have failed.

Section 21.5 of the parties' agreement lists the conditions precedent to suit against the tribe: "21.5 Conditions Precedent to Suit: Owner does not consent to be sued and Manager shall not initiate any action against Owner unless the Arbitration Board has expressly determined that (1) Owner has wrongfully, in bad faith, and without just cause, terminated this Management Agreement; (2) Manager has fulfilled all of its obligations under this Agreement; and (3) Manager has complied with all the pre-arbitration and claim procedures set forth herein. Prior to initiating any action against Owner hereunder, manager shall deliver to owner a true copy of said award, and Owner shall have ten (10) days in which to comply therewith."

---

[1]Grounds for terminating the management contract with cause include "(1) theft, gross negligence, willful failure to perform; (2) failure to make payments of any moneys due to Owner; (3) Manager's or manager's principles', employees', or agents' intentional interference with Owner's Tribal Affairs as described in Article 19; (4) any act of insolvency by Manager; (5) any involvement with or associating with, or doing business with, or allowing the Business to become influenced by or associated with persons or organizations identified by the State of California or by the United States Department of Justice as affiliated with organized crime; (6) any other cause identified herein as cause for termination [e.g., assignment, transfer or encumbrance (§ 16.2)]; or (7) other material breach of this Agreement."

However, the tribe did not consent to suit regarding issues or under other conditions beyond those specified in the contract. Section 21.8 of the parties' contract states: "Express Limitations on Consent to Suit. Owner consents only to an action for Owner's wrongful termination of this Agreement in bad faith and without cause being brought only by the Manager for moneys in an amount not to exceed the manager's unreimbursed initial capital contribution not to exceed $5,000,000. Owner's limited waiver of sovereign immunity is conditioned upon satisfaction of each and every one of the following conditions prior to the initiation of any action permitted herein [i.e., informal negotiations and arbitration]."

The United States Department of the Interior, Bureau of Indian Affairs, approved the management agreement in September 1992.

According to GWC the gaming enterprise proved to be tremendously profitable, earning gross profits of approximately $100 million per year.

In the meantime the former principals of ECI/GWC began negotiations to provide similar gaming management services for the Santa Inez Band of Mission Indians in Santa Barbara County. According to GWC's complaint, the parties reached an agreement and entered into a written management contract in August 1992.

In 1993 ECI assigned its rights and interests in its management agreement with the Morongo Band to GWC.

GWC's complaint alleges when the tribe realized the profit potential of the gaming enterprise the tribe, its council, and the individual members of the tribal council and tribe, acting through their general counsel, decided to concoct a fraudulent scheme to cancel the management contract and oust ECI/GWC from the gaming enterprise. To accomplish this goal, GWC's complaint alleges Indian informants contacted governmental authorities, including the National Indian Gaming Commission, the Federal Bureau of Investigation and the United States Attorney to falsely report ECI/GWC and its former principals had engaged in racketeering, self-dealing and was operating illegal gaming devices on the reservation.

GWC candidly admits in its complaint ECI and its principals were investigated, indicted and convicted of gaming violations. Its complaint alleges "[b]ased on the false and fabricated charges made by said Native American informant(s), the FBI and U.S. Attorney's Office did undertake an investigation of the Morongo gaming operations and GWC's management of same and U.S. Attorney did, in May 1994, obtain a criminal indictment against

GWC and its former principals and proceeded against them in the United States District Court . . . charging them with 23 felony counts of violations of gaming and other laws . . . ." After the Ninth Circuit reversed the district court's dismissal of 22 of the 23 counts of the indictment, ECI/GWC and its former principals pled guilty to a charge of possession of illegal gaming devices and the district court dismissed the other 22 counts of the indictment. (See *U.S.* v. *E.C. Investments, Inc.* (9th Cir. 1996) 77 F.3d 327.)

The Morongo Band suspended its management contract with ECI/GWC for cause in May 1994 based on the allegations of the felony indictment for undisclosed self-dealing. GWC alleges the defendants thereafter wrongfully induced the Santa Inez Band of Mission Indians to cancel its management contract with ECI/GWC as well. In April 1995 the Morongo Band formally terminated the management contract, *without cause,* on the ground ECI/GWC had at that point more than fully recouped its initial investment.

As noted, GWC filed its first amended complaint for bad faith breach of contract, fraud, breach of fiduciary duty, constructive fraud, conversion, interference with business relations, abuse of process, civil RICO, money had and received, imposition of a constructive trust, accounting and dissolution of partnership against the tribe, its council, its individual council members, individual members of the tribe and the tribe's general counsel. GWC seeks over $1 billion in damages, subject to trebling under the count for the alleged civil RICO violation.

Defendants filed a motion to stay the proceedings, or in the alternative to quash, on the ground federal law completely preempted Indian gaming and gaming contract regulation which deprived the state court of jurisdiction to rule on the claims alleged in the complaint. Defendants also moved to quash on the ground the court lacked personal jurisdiction over the tribe, its officers, members and agents due to their sovereign immunity.

GWC opposed the motion, claiming defendants' motion to quash was procedurally infirm because it attacked subject matter jurisdiction rather than personal jurisdiction and as a result their motions constituted a general appearance, which gave the trial court jurisdiction. GWC also challenged defendants' claims of federal preemption and sovereign immunity. GWC claimed the preemption doctrine did not apply because federal law expressly permits private state court civil actions between individual Indians and others; general counsel and her law firm are not Indians; and, in any event the tribe had expressly waived its sovereign immunity by consenting to arbitration and to suit in the management contract.

After reviewing the parties' papers, including documentary evidence and affidavits, and hearing oral argument, the trial court found defendants' arguments meritorious. It thus granted their motions to quash and dismissed the action.

GWC appeals from the judgment of dismissal.

## DISCUSSION

I.  *This Court's Review Is Not Limited to the Allegations of the Complaint.*

In this case defendants moved to stay/quash/dismiss on the dual grounds of federal preemption and sovereign immunity. Defendants claimed the state court lacked personal jurisdiction. GWC argues defendants were not challenging lack of personal jurisdiction but instead the state court's subject matter jurisdiction and thus their choice of a motion to quash to challenge the court's jurisdiction was procedurally infirm.

GWC argues defendants should have raised their subject matter jurisdiction defenses by way of answer, demurrer, judgment on the pleadings or motion for summary judgment. GWC points out the general rule provides subject matter jurisdiction is determined strictly from the face of a well-pleaded complaint. (Citing *Boisclair* v. *Superior Court* (1990) 51 Cal.3d 1140, 1156 [276 Cal.Rptr. 62, 801 P.2d 305].) Thus, GWC argues this court is bound to accept as true the factual allegations of the complaint in determining whether the trial court properly found subject matter jurisdiction lacking, and further argues this court must disregard any matter beyond the pleadings.

GWC relies on the California Supreme Court's decision in *Greener* v. *Workers' Comp. Appeals Bd.* (1993) 6 Cal.4th 1028 [25 Cal.Rptr.2d 539, 863 P.2d 784]. There law students filed suit for declaratory and injunctive relief against the board to challenge the constitutionality of various laws which terminated the power of the board to make awards of attorney fees to nonlawyers. The board moved to quash service of summons and to dismiss the complaint on the grounds the superior court lacked both personal and subject matter jurisdiction. The court explained the board's procedural device for challenging the superior court's jurisdiction was improper. "A motion to quash service of summons lies on the ground that the court lacks personal, not subject matter, jurisdiction over the moving party. (Code Civ. Proc., § 418.10.)" (*Id.* at p. 1036.) The court stated a challenge to subject matter jurisdiction should be made by means of a demurrer, motion to strike, motion for judgment on the pleadings, motion for summary judgment or in

an answer, but not in a " 'special appearance' by a motion to quash service of summons." (*Ibid.*) "We do not, and indeed may not, approve the use of a motion to quash as an alternative to a demurrer, nor do we accept the assumption of the Board that by making its challenge by motion to quash and dismiss it avoided making a general appearance in the action. Notwithstanding a 'special appearance' designation on a motion to quash, if the movant seeks relief on any basis other than lack of personal jurisdiction, he or she makes a general appearance. (See 2 Witkin, Cal. Procedure [(3d ed. 1985)], Jurisdiction, § 149 et seq., p. 534, and cases cited.)" (*Id.* at pp. 1036-1037.)

In this context of workers' compensation law the *Greener* court held the trial court erred in granting the board's motion to quash insofar as it claimed lack of personal jurisdiction because there is no statutory provision which makes the board exempt or immune from suit. However, the court held the trial court properly granted the motion insofar as its order of dismissal was based on the absence of subject matter jurisdiction because if the relief sought had been granted, the effect of the judgment would have been to violate the law. (6 Cal.4th at pp. 1042-1044.)

Based on *Greener*, GWC claims the defendants' designation of their motion as a special appearance and as a motion to quash should be disregarded because the motion in substance was an attack on the court's subject matter jurisdiction and was thus the functional equivalent of a demurrer or a motion for judgment on the pleadings. Accordingly, GWC argues this court is limited in its review to the allegations of the complaint to determine if it discloses on its face a lack of subject matter jurisdiction. (Citing *Hoffman* v. *State Farm Fire & Casualty Co.* (1993) 16 Cal.App.4th 184, 189 [19 Cal.Rptr.2d 809].)

The question of state court subject matter jurisdiction *does* appear on the face of the complaint. The allegations of GWC's complaint in fact reveal the causes of action all somehow involve Indian gaming or Indian gaming contracts and thus the potential preemptive effect of federal law in regulating Indian gaming. (See, *post*, pt. III.) As noted, the trial court specifically found federal preemption provided a separate and independent ground for granting the motion to quash/dismiss.

On the other hand, we note some inconsistency in the law regarding whether claims of sovereign immunity affect a court's personal as opposed to subject matter jurisdiction. According to Witkin, "[i]n its substantive aspect, sovereign immunity is concerned with immunity of a sovereign state

and its governmental subdivisions and agencies from *liability*, except to the extent expressly permitted by statute. [Citations.]" (2 Witkin, Cal. Procedure (4th ed. 1996) Jurisdiction, § 91, p. 626, italics in original.) By contrast, the procedural aspect of sovereign immunity "relates to the immunity of the sovereign from *suit*, except with its *consent*." *(Ibid.,* italics in original.) Because of these dual aspects of sovereign immunity Witkin notes "[i]t is difficult . . . to find authority to classify the defect as involving subject matter jurisdiction or jurisdiction of the person." (2 Witkin, Cal. Procedure, *supra*, Jurisdiction, § 91, p. 627.)

We note a substantial number of published opinions discussing sovereign immunity in the context of Indian affairs generally presume without much discussion or analysis a challenge to a state court's authority to act involves a challenge to that court's subject matter jurisdiction. (See, e.g., *Boisclair* v. *Superior Court, supra,* 51 Cal.3d 1140, 1144, fn. 1; *Middletown Rancheria of Pomo Indians* v. *Workers' Comp. Appeals Bd.* (1998) 60 Cal.App.4th 1340, 1356 [71 Cal.Rptr.2d 105]; *Inland Casino Corp.* v. *Superior Court* (1992) 8 Cal.App.4th 770, 778 [10 Cal.Rptr.2d 497].)

Nevertheless, even assuming sovereign immunity relates to the state court's subject matter rather than personal jurisdiction, it does not follow we must be constrained in our review of the trial court's ruling to simply the allegations of the complaint as if defendants had demurred. Indeed in *Boisclair* v. *Superior Court, supra,* 51 Cal.3d 1140, the Supreme Court reviewed a similar claim of Indian sovereign immunity through the procedural device of a hybrid motion to quash/dismiss. There the court noted "although a motion to quash is normally directed at defects in personal, as opposed to subject matter, jurisdiction (see 2 Witkin, Cal. Procedure (3d ed. 1985) Jurisdiction, § 161, pp. 546-548), we have recognized the hybrid motion to quash/dismiss as a proper means of challenging the court's authority without making a general appearance. (*Goodwine* v. *Superior Court* (1965) 63 Cal.2d 481, 484-485 [47 Cal.Rptr. 201, 407 P.2d 1]; see also *Kumar* v. *Superior Court* (1982) 32 Cal.3d 689, 691 [186 Cal.Rptr. 772, 652 P.2d 1003] [propriety of motion assumed].) This is consistent with the general rule that subject matter jurisdiction can be challenged at any time during the course of an action. (*Barnick* v. *Longs Drug Stores* (1988) 203 Cal.App.3d 377, 379 [250 Cal.Rptr. 10].)" (*Id.* at p. 1144, fn. 1.)

If the lack of subject matter jurisdiction can be raised at any time, it seems to follow no specified procedural vehicle should be required to bring the matter to the court's attention. For example, it would be anomalous to require a defendant to demur to a complaint, or to file another answer, or a

motion for judgment on the pleadings if the defect only came to light in the middle of a trial. Moreover, if subject matter jurisdiction may be challenged at any time during the course of an action it is logical for the court to consider all admissible evidence then before it in making its determination— whatever the procedural posture of the case. Permitting as thorough a review by the court considering the challenge is in accord with the principle a court's subject matter jurisdiction is so fundamental it may be attacked at any time.

In the present case the trial court was faced with competing claims whether the defendants had waived their sovereign immunity and had consented to suit. To resolve the conflict the trial court necessarily had to go beyond the pleadings and contract language to consider the testimonial and documentary evidence submitted with defendants' motion to stay/quash/ dismiss and GWC's opposition to those motions. "Generally, in entertaining a motion to dismiss, the district court must accept the allegations of the complaint as true, and construe all inferences in the plaintiff's favor. [Citation.] Where the motion to dismiss is based on a claim of . . . sovereign immunity, which provides protection from suit and not merely a defense to liability, however, the court must engage in sufficient pretrial factual and legal determinations to ' "satisfy itself of its authority to hear the case" before trial.' . . ." (*Jungquist* v. *Sheikh Sultan Bin Khalifa Al Nahyan* (D.C. Cir. 1997) 115 F.3d 1020, 1027-1028 [325 App.D.C. 117]; cf. *Ziller Electronics Lab GmbH* v. *Superior Court* (1988) 206 Cal.App.3d 1222, 1232-1233 [254 Cal.Rptr. 410] [when a defendant challenges personal jurisdiction, the burden shifts to the plaintiff to prove the necessary jurisdictional criteria are met by competent evidence in affidavits and authenticated documentary evidence; allegations in an unverified complaint are inadequate.].)

Given challenges to a court's subject matter jurisdiction may be raised at any time—including on appeal—in the interests of judicial economy we will similarly consider all matters considered by the trial court in reviewing its conclusions.[2] (See 5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 922, p. 380, ["Lack of *subject matter* jurisdiction is not waived by failure to demur, but can be attacked by motion or suggestion at any time during trial

---

[2] We also reject GWC's argument defendants made a general appearance and thereby waived their claim of sovereign immunity by requesting a stay of the action. Each of defendants' motions to stay/quash/dismiss presented in substance a challenge to the trial court's authority to proceed in the matter. (See *Fidelity Bank* v. *Kettler* (1968) 264 Cal.App.2d 481, 485-486 [70 Cal.Rptr. 500] [if a party appears to object to consideration of any aspect of the case on the ground the court lacks jurisdiction, the appearance is special].) To waive a claim of sovereign immunity and consent to suit requires something more—for example, request for relief on the merits rather than just a challenge to the court's jurisdiction. (See,

or on appeal, or by application for an extraordinary writ, and even by collateral attack in most cases. . . ."(Italics in orginal.)].)

II. *The Tribe Did Not Waive Its Sovereign Immunity for Purposes of This Suit.*

"Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers. *Turner* v. *United States*, 248 U. S. 354, 358 [39 S.Ct. 109, 110, 63 L.Ed. 291] (1919); *United States* v. *United States Fidelity & Guaranty Co.*, 309 U. S. 506, 512-513 [60 S.Ct. 653, 656, 84 L.Ed. 894] (1940); *Puyallup Tribe* v. *Washington Dept. of Game*, 433 U. S. 165, 172-173 [97 S.Ct. 2616, 2620-2621, 53 L.Ed.2d 667] (1977). This aspect of tribal sovereignty, like all others, is subject to the superior and plenary control of Congress. But 'without congressional authorization,' the 'Indian Nations are exempt from suit.' *United States* v. *United States Fidelity & Guaranty Co., supra*, [309 U.S.,] at 512 [60 S.Ct. at 656].

"It is settled that a waiver of sovereign immunity ' "cannot be implied but must be unequivocally expressed." ' *United States* v. *Testan*, 424 U. S. 392, 399 [96 S.Ct. 948, 953, 47 L.Ed.2d 114] (1976), quoting, *United States* v. *King*, 395 U. S. 1, 4 [89 S.Ct. 1501, 1502, 23 L.Ed.2d 52] (1969)." (*Santa Clara Pueblo* v. *Martinez* (1978) 436 U.S. 49, 58-59 [98 S.Ct. 1670, 1677, 56 L.Ed.2d 106]; see also *Amer. Indian Agr. Credit* v. *Stand. Rock Sioux Tribe* (8th Cir. 1985) 780 F.2d 1374, 1377 [implication in promissory note providing for attorney fees in event of suit insufficient to waive sovereign immunity]; *Pan American Co.* v. *Sycuan Band of Mission Indians* (9th Cir. 1989) 884 F.2d 416, 419 [". . . tribal sovereign immunity remains intact unless surrendered in express and unequivocal terms."]; *Hydrothermal Energy Corp.* v. *Fort Bidwell Indian Community Council* (1985) 170 Cal.App.3d 489 [216 Cal.Rptr. 59] [tribal chairman lacked authority to waive the tribe's sovereign immunity, thus arbitrator did not gain jurisdiction merely through chairman's signature on a contract which included an arbitration clause].)

GWC concedes that as a general matter the Morongo Band enjoys sovereign immunity from suit. (See, e.g., *Kiowa Tribe of Okla.* v. *Manufacturing*

e.g., *United States* v. *State of Or.* (9th Cir. 1981) 657 F.2d 1009, 1014 [by successfully intervening in the action tribe consented to suit].)

Nor did defendants' ex parte request for a continuance constitute a waiver of their claims in the context of this case. GWC relies on *Zobel* v. *Zobel* (1907) 151 Cal. 98, 100-101 [90 P. 191] for the proposition when a party seeks a continuation of the action he is invoking the court's general jurisdiction. The *Zobel* decision is distinguishable. There the defendant had filed an answer, demurred and had appeared at the hearing on the plaintiff's motion to strike the defendant's pleadings. These additional facts are absent from the case at bar.

*Technologies, Inc.* (1998) 523 U.S. 751, 760 [118 S.Ct. 1700, 1705, 140 L.Ed.2d 981] ["Tribes enjoy immunity from suits on contracts, whether those contracts involve governmental or commercial activities and whether they were made on or off a reservation."].) ■ However, GWC claims the trial court erred in finding the doctrine of sovereign immunity was a bar to the present litigation because it claims the tribe waived its sovereign immunity and consented to suit by expressly agreeing to arbitration and to suit in its management contract with ECI/GWC.

It is true the tribe agreed to waive its sovereign immunity and consent to suit, but only in a narrowly defined situation. According to various clauses in the parties' management contract, GWC could only file suit, and then only to recover the balance of its initial investment if (1) a board of arbitrators found the tribe had breached the management contract without cause and in bad faith; (2) at a time GWC had not yet recouped its initial investment in the enterprise; (3) and despite informal negotiations prior to the arbitration; and (4) a lapse of more than 10 days after receipt of the arbitration board's findings without a satisfactory response from the tribe. If these conditions were satisfied, then the tribe agreed to submit to litigation to the extent necessary to permit ECI/GWC to recover the balance of its initial investment. For all other situations the tribe expressly reserved its sovereign immunity in the management agreement.[3]

Nowhere in GWC's complaint does it allege it complied with any of these preconditions to bringing suit under the management contract. Indeed, the undisputed evidence before the trial court indicates GWC could not amend its complaint to allege it had not yet recovered its initial investment or that it had satisfied the necessary conditions of making a request to the tribe for arbitration to recover any balance of its initial investment and the like.

The tribal chairperson, Mary Ann Andreas, filed an affidavit in the present action. In her affidavit she states the tribal council voted to terminate its management contract with ECI/GWC under the authority of sections 20.2 and 21.1 of the management agreement, which provided the agreement could be terminated without cause and without abitration if ECI/GWC had recovered its investment in full in an amount not to exceed $5 million. According to the chairperson, at the time the tribe terminated the management agreement ECI/GWC had already been paid "an amount significantly in excess of its initial investment." Included in the record is a copy of the letter in which the tribe notified ECI/GWC it was terminating the contract under the contractual provisions providing for termination when ECI/GWC had fully

---

[3]The fact the tribe involved itself in litigation on a prior occasion does not, under prevailing authority, constitute an express waiver of sovereign immunity for all future purposes.

recouped its investment. In addition, the chairperson stated termination was appropriate under the terms of the contract because ECI/GWC failed to advance funds as required by the management agreement and had improperly assigned the management contract without its consent and without approval of the Secretary of the Interior as required under federal law controlling Indian gaming operations.

The chief financial officer and controller of Casino Morongo also filed an affidavit. Based on audited financial statements for Casino Morongo he stated ECI/GWC had advanced $1,797,132 of the $5 million ECI/GWC was to advance under the management contract. He further stated the tribe had paid ECI/GWC $4,162,875 prior to ECI/GWC's suspension as manager in May 1994 and subsequent termination in April 1995, or $2,365,743 more in management fees than the amount of ECI/GWC's total advances. Accompanying his affidavit are redacted copies of financial statements for Casino Morongo for the relevant periods.

In short, it appears the conditions under which the tribe agreed to waive its sovereign immunity and consent to arbitration and suit to resolve contract disputes were not satisfied in this case. Moreover, the management agreement makes clear, and GWC does not dispute, the tribe did not waive its sovereign immunity regarding any of the other 14 causes of action alleging tort claims. Accordingly, the trial court did not err in finding sovereign immunity barred this suit against the tribe and its governing body.

III. *The Individual Defendants Are Similarly Immune From Suit.*

█ Tribal officials are not necessarily immune from suit. (*Santa Clara Pueblo* v. *Martinez, supra,* 436 U.S. 49, 59 [98 S.Ct. 1670, 1677].) When tribal officials act beyond their authority they lose their right to the sovereign's immunity. (*Ibid.; Imperial Granite Co.* v. *Pala Band of Mission Indians* (9th Cir. 1991) 940 F.2d 1269, 1271.) On the other hand, sovereign immunity does extend to tribal officials when they act in their official capacity and within the scope of their authority. (*United States* v. *State of Or., supra,* 657 F.2d 1009, 1013, fn. 8; *Davis* v. *Littell* (9th Cir. 1968) 398 F.2d 83, 84-85; *Imperial Granite Co.* v. *Pala Band of Mission Indians, supra,* 940 F.2d 1269, 1271.)

GWC's first amended complaint alleges no individual actions by any of the tribal officials on the tribal council named as defendants, (or, for that matter, any of the individual tribal members named as defendants). It does not allege any tribal official acted independently of the tribe or its council. Thus the allegations of GWC's first amended complaint demonstrate the action is in substance against the tribe itself.

The complaint alleges the tribal council "approves," "rejects" and "implements" "policies and action for and on behalf of the MORONGO BAND." In a specific example, the complaint alleges "the MORONGO BAND, acting through the TRIBAL COUNCIL, unlawfully and in violation and in breach of the Management Agreement, suspended the Management Agreement and GWC's right thereunder and withheld from GWC all of the profits to which it was entitled."

From the complaint it appears the acts of the tribal officials about which GWC complains are the official actions taken by the tribal council on behalf of the tribe in voting to enter the management contract allegedly without intent to perform, in allegedly notifying government officials of ECI/GWC's suspected illegal acts, and in voting to suspend and then terminate the management agreement. Without more it is difficult to view the suit against the tribal officials as anything other than a suit against the tribe itself.

The individual council members' votes on these different matters may have independent significance, but it was the collective action by the tribal council after the votes which caused GWC's alleged injuries. In other words, the allegations of the complaint do not suggest any individual council member acted beyond his or her official authority in so voting. On the contrary, the complaint acknowledges each acted in his or her representative capacity, as a member of the tribal council, and on behalf of the tribe. In this case it was clearly the tribe which authorized canceling the management agreement with GWC.

On the other hand sovereign immunity does not generally apply to acts of individual tribal members. (*Puyallup Tribe* v. *Washington Dept. Game* (1977) 433 U.S. 165, 171-172 [97 S.Ct. 2616, 2620-2621, 53 L.Ed.2d 667]; *United States* v. *State of Or., supra,* 657 F.2d 1009, 1013, fn. 8.) Nevertheless, the complaint acknowledges even the individual tribal members allegedly were acting "on behalf of the Morongo Band" and were alleged to have been "employed by or associated with Casino Morongo and the MORONGO BAND." Again the complaint alleges no specific act committed by any individual member. It appears the individual members were included in the complaint as defendants simply because they are members of the tribe.

The most the complaint alleges with regard to the individual tribal council and member defendants is they approved the actions of the tribe and the tribal council, and as members of the tribe, indirectly reaped the benefits of their tribe's decision to terminate its management agreement with GWC. The complaint alleges the individuals "approved of the actions of, acted together

and in concert with, agreed and conspired with, accepted the benefits of the action of and/or ratified the actions of the TRIBAL COUNCIL (the members thereof acting both on behalf of the MORONGO BAND and in their individual capacity for their own personal aggrandizement) . . . in devising and carrying out their scheme to deprive GWC of its share of the profits, to divert the same to the MORONGO BAND and themselves and to conceal same from Plaintiff." No other allegation of the complaint specifies any act taken by any individual member beyond his or her tacit acceptance and/or approval of the tribe's actions and the receipt of whatever benefits might flow to them individually by virtue of the tribe's official governmental actions. In other words, the substance of the complaint's allegations concerning the individual Indian defendants are again in reality against the tribe's allegedly wrongful actions.

■ The non-Indian law firm and general counsel are similarly immune from suit for actions taken or opinions given in rendering legal services to the tribe. Here the complaint acknowledges defendants Alexander & Karshmer and Barbara E. Karshmer, Inc., legal counsel for the tribe, were "at all times herein mentioned retained by and representing the MORONGO BAND." The complaint further alleges "the MORONGO BAND did, on April 18, 1995, acting through the TRIBAL COUNCIL and KARSHMER, terminate the Management Agreement, in violation and in breach thereof, on the ground that GWC's former principals violated the law—for possession of illegal gaming devices. [¶] Plaintiff is informed and believes and thereon alleges that KARSHMER counseled and advised the MORONGO BAND and its members to carry out their fraudulent misconduct as alleged [the allegedly false and fabricated charges GWC management violated the law]."

In providing legal representation—even advising, counseling and conspiring with the tribe to wrongfully terminate the management contract—counsel were similarly immune from liability for those professional services. (See *Davis* v. *Littell, supra,* 398 F.2d 83, 85 [attorney who advised tribal council regarding the competence and integrity of an employee is immune from liability for defamation under the executive privilege].) The rationale behind barring claims against legal counsel based on their advice to the Indian tribe which contracted for their services regarding gaming enterprises was aptly explained in *Gaming Corp. of America* v. *Dorsey & Whitney* (8th Cir. 1996) 88 F.3d 536. There the federal appellate court rejected claims general counsel could be liable in tort for allegedly making a management company appear unsuitable as manager for the tribe's gaming operations during the licensing process. (88 F.3d at p. 540.) The court explained, "[t]ribes need to be able to hire agents, including counsel, to assist in the process of regulating gaming. As any government with aspects of sovereignty, a tribe must be

able to expect loyalty and candor from its agents. If the tribe's relationship with its attorney, or attorney advice to it, could be explored in litigation in an unrestricted fashion, its ability to receive the candid advice essential to a thorough licensing process would be compromised. The purpose of Congress in requiring background checks could be thwarted if retained counsel were inhibited in discussing with the tribe what is learned during licensing investigations, for example. Some causes of action could have a direct effect on the tribe's efforts to conduct its licensing process even where the tribe is not a party." (*Gaming Corp. of America* v. *Dorsey & Whitney, supra*, 88 F.3d at p. 550.)

As a sovereign the Morongo Band "enjoys sufficient independent status and control over its own laws and internal relationships to be able to accord absolute privilege to its officers within the areas of tribal control." (*Davis* v. *Littell, supra*, 398 F.2d at p. 84.) Moreover, as a sovereign the Morongo Band had the "[right] to look beyond its own membership for capable legal officers, and to contract for their services." (*Id.* at p. 85.) In performing their function counsel must be free to express legal opinions and give advice unimpeded by fear their relationship with the tribe will be exposed to examination and potential liability for the advice and opinions given. Refusing to recognize an extension of a tribe's sovereign immunity to cover general counsel's advice to the tribe could not only jeopardize the tribe's interests but could also adversely influence counsel's representation of the tribe in the future. For these reasons counsel in allegedly advising the tribe to wrongfully terminate the management contract are similarly covered by the tribe's sovereign immunity.

In sum, we conclude the trial court did not err in finding the Indian and non-Indian individual defendants were immune from suit.

### IV. *Federal Law Has Completely Preempted the Field of Indian Gaming, Thus the State Court Had No Jurisdiction Over the Claims Raised in the Complaint.*

■ As an alternative ground for granting defendants' motion to quash and for dismissing the action, the trial court found the allegations of GWC's first amended complaint, however framed, all concerned the management agreement to operate gaming at the tribe's Casino Morongo. Because all the causes of action and allegations of the complaint concerned Indian gaming, the court concluded federal law preempted the field and dismissed the action.

In a case predating the Indian Gaming Regulatory Act (25 U.S.C. § 2701 et seq.) the United States Supreme Court rejected the State of California's

attempt to regulate card games and bingo games on Indian reservations in *California* v. *Cabazon Band of Mission Indians, supra,* 480 U.S. 202. The court noted "[d]ecision in this case turns on whether state authority is pre-empted by the operation of federal law; and '[s]tate jurisdiction is pre-empted . . . if it interferes or is incompatible with federal and tribal interest reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority.' [*New Mexico* v.] *Mescalero* [*Apache Tribe* (1983)] 462 U.S. [324] at 333, 334 [103 S.Ct. 2378 at 2385, 2386, 76 L.Ed.2d 611]. The inquiry is to proceed in light of traditional notions of Indian sovereignty and the congressional goal of Indian self-government, including its 'overriding goal' of encouraging tribal self-sufficiency and economic development. *Id.*, at 334-335, . . ." (480 U.S. at p. 216 [107 S.Ct. at p. 1092].) The court reviewed the federal programs then in place to promote and regulate tribal enterprises and concluded California's interest in preventing infiltration of tribal bingo enterprises by organized crime did "not justify state regulation of the tribal bingo enterprises in light of the compelling federal and tribal interests supporting them." (480 U.S. at pp. 221-222 [107 S.Ct. at p. 1095].)

A year later Congress passed the Indian Gaming Regulatory Act (IGRA), which provides a comprehensive scheme for regulating gaming on Indian lands. In 25 United States Code section 2702, part of the act, Congress declared its purpose was:

"(1) to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments;

"(2) to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players; and

"(3) to declare that the establishment of independent Federal regulatory authority for gaming on Indian lands, the establishment of Federal standards for gaming on Indian lands, and the establishment of a National Indian Gaming Commission are necessary to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue." (25 U.S.C. § 2702.)

Based on Congress's statement of purpose and the act's comprehensive regulatory scheme, courts which have considered the question conclude

federal courts have exclusive jurisdiction to review issues involving Indian gaming activities. (See, e.g., *Tamiami Partners* v. *Miccosukee Tribe of Indians* (11th Cir. 1995) 63 F.3d 1030, 1033 ["The occupation of this field by [IGRA] is evidenced by the broad reach of the statute's regulatory and enforcement provisions and is underscored by the comprehensive regulations promulgated under the statute."]; *Cabazon Band of Mission Indians* v. *Wilson* (9th Cir. 1994) 37 F.3d 430, 433-435 [IGRA preempts state license fee based on wagers at Indian gaming facilities].)

The Eighth Circuit in *Gaming Corp. of America* v. *Dorsey & Whitney, supra*, 88 F.3d 536, provides a comprehensive analysis of IGRA's federal preemptive effect over Indian gaming matters. The question presented in that case was whether remand to state court was appropriate in an action alleging numerous state law claims against a law firm which advised an Indian tribe not to engage the plaintiff gaming management company. After review the court concluded the claims, however phrased, all concerned Indian gaming over which the state court had no jurisdiction. "The statute itself and its legislative history show the intent of Congress that IGRA control Indian gaming and that state regulation of gaming take place within the statute's carefully defined structure. We therefore conclude that IGRA has the requisite extraordinary preemptive force necessary to satisfy the complete preemption exception to the well-pleaded complaint rule. [¶] . . . [¶] The conclusion that IGRA completely preempts state law is reinforced when the statute is viewed in the context of Indian law. 'The traditional notions of Indian sovereignty provide a crucial "backdrop" against which any assertion of state authority must be assessed.' [Citation.] A long line of Supreme Court decisions illustrates the importance of the federal and tribal interests in Indian cases and the authority of Congress to protect those interests." (88 F.3d at p. 547.)

Similarly in the case at bar the allegations of GWC's complaint reveal all causes of action relate to the defendants' allegedly wrongful termination of its contract to manage the tribe's gaming operations at Casino Morongo. As a result we agree GWC's claims, however styled, are preempted by federal law. We therefore further conclude the trial court did not err in ruling the state court lacked jurisdiction and in dismissing the action.

GWC acknowledges exclusive federal authority over Indian affairs is rooted in three different provisions of the United States Constitution (art. I, § 8, cl. 3; art. II, § 2, cl. 2 and art. VI, cl. 2), which, together with extensive congressional legislation on Indian affairs, has broadly preempted state law. (See *Boisclair* v. *Superior Court, supra*, 51 Cal.3d at p. 1148.) It nevertheless

argues federal preemption presents no bar to the present litigation because in Public Law No. 280 Congress expressly authorized private civil litigation between Indians and civil litigation in which Indians are parties.

In 1953 Congress enacted Public Law No. 280, section 4, 67 Statutes at Large 589, codified at 28 United States Code section 1360. It grants both civil and criminal jurisdiction over Indian country to designated states, including California, and permits other states the option of assuming similar jurisdiction. This section provides in relevant part: "(a) Each of the States listed in the following table shall have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country listed opposite the name of the State to the same extent that such State has jurisdiction over other causes of action, and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State: [¶] . . . [¶] California . . . All Indian country within the State . . . ." (28 U.S.C. § 1360).

GWC claims its action falls within this exception to federal preemption because this case involves civil litigation in which individual Indians are parties. We cannot agree.

It is settled 28 United States Code section 1360 confers jurisdiction only over individual Indians, and not over Indian tribes or tribal entities. (*Bryan* v. *Itasca County, Minnesota* (1976) 426 U.S. 373, 389 [96 S.Ct. 2102, 2111, 48 L.Ed.2d 710] [statute extending civil litigation jurisdiction of the states to Indian reservations did not include in that grant of jurisdiction the power to tax]; see also *Middletown Rancheria of Pomo Indians* v. *Workers' Comp. Appeals Bd., supra,* 60 Cal.App.4th 1340, 1356 [28 United Sates Code section 1360 did not grant Workers' Compensation Appeals Board subject matter jurisdiction over the tribe for purposes of enforcing California's workers' compensation laws].)

The *Bryan* court found Congress's use of the phrase " ' "civil laws . . . of general application" ' " narrowed the reach of state court jurisdiction. The court thus concluded Congress meant this phrase to cover only civil litigation involving strictly " ' "private persons or private property" ' " touching on, " 'the laws of contract, tort, marriage, divorce, insanity, descent,' " and the like. (*Bryan* v. *Itasca County, supra,* 426 U.S. 373, 385, fn. 10 [96 S.Ct. 2102, 2108].) Other courts have viewed the scope of Congress's grant of

state court jurisdiction over private individual Indians as similarly limited. (See, e.g., *Boisclair* v. *Superior Court, supra*, 51 Cal.3d 1140, 1157 [individual Indian defendants could be liable if they wrongfully blocked the company's access road on non-Indian land]; *In re Marriage of Purnel* (1997) 52 Cal.App.4th 527 [60 Cal.Rptr.2d 667] [state court had jurisdiction under authority of 28 United States Code section 1360 to order Indian wife to pay child support and attorney fees in marital dissolution action].)

GWC cites no decisional authority, and we have found none, to support its claim 28 United States Code section 1360 permits resolution of Indian gaming and gaming contract disputes in state court—even as against individual Indians. The reason for this absence of authority seems clear—the federal IGRA completely preempts the field of litigation involving Indian gaming. Thus, in these circumstances further amendment of the complaint would fail to cure the defect.

## DISPOSITION

The judgment is affirmed. Respondents to recover their costs of appeal.

Lillie, P. J., and Neal, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 21, 1999.