Filed 3/30/22  Buford v. Superior Court CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| TERRY BUFORD, | C095355 |
| Plaintiff and Appellant, | (Super. Ct. No. CVG18672) |
| v. | |
| THE SUPERIOR COURT OF SACRAMENTO COUNTY et al., | |
| Defendants and Respondents. | |

In this appeal from a *Yolo* County Superior Court judgment, Terry Buford argues he was entitled to various forms of declaratory and injunctive relief arising out of the *Sacramento* County Superior Court's denial of his request for a transcript of his criminal trial.  Buford seeks the transcript to launch a collateral attack on his criminal convictions in Sacramento County Superior Court for orchestrating the killing his unborn child by conspiring to beat his seven months' pregnant ex-girlfriend.  (See generally *People v. Curry* (2007) 158 Cal.App.4th 766 (*Curry*) [affirming the convictions of Buford and his

1

coconspirators].) Rather than dismiss Buford's action for lack of subject matter jurisdiction, the Yolo County Superior Court accepted a stipulation of the parties to adjudicate Buford's civil complaint about actions by Sacramento County Superior Court judges and clerks. Subject matter jurisdiction, however, cannot be manufactured by consent or stipulation of the parties. Accordingly, we vacate the judgment of dismissal issued in response to defendants' demurrer and order the Yolo County Superior Court to enter a new judgment of dismissal for lack of jurisdiction.

## FACTUAL AND PROCEDURAL HISTORY

### *In Sacramento County*

We recite the facts of the crimes committed by Buford and his coconspirators from our opinion in *Curry*. In pertinent part, *Curry* recounts: "L.R. dated Buford before she became pregnant with his child in February 2004. As the pregnancy progressed, Buford told L.R. she should have an abortion. L.R. wanted to have the baby and told Buford that he could 'just pay child support' if he 'didn't want to be there.' Buford acted indifferently and began to deny that the child was his. When L.R. was about five months pregnant, L.R. and Buford broke off their relationship. [¶] At some time in the weeks leading up to the assault, L.R. called Buford's cell phone. A woman answered and identified herself as Buford's sister. The same woman, whose voice L.R. identified as [that of Titenesha Lanae Russell], called L.R. to ask about the baby and the identity of the father. She continued to make harassing phone calls to L.R., calling her a 'bitch' and threatening to kill L.R. and her baby." (*Curry, supra*, 158 Cal.App.4th at pp. 772-773.)

Tashara Boone was called as a witness during the criminal trial and testified:

"She and Buford were 'best friends.' On September 20, 2004, five days before the assault and kidnapping, Buford asked Boone to 'beat somebody up.' She agreed to help him. In subsequent conversations, Boone learned that Buford and L.R. had argued over whether he was the baby's father.

2

"Between September 20 and September 25, Buford and Boone devised a plan. Buford would invite L.R. to the movies but take her to a park where Boone would beat her up. The goal was to force L.R. to have a miscarriage. Boone asked Russell to help beat up L.R. and she agreed.

"About 8:00 p.m. on September 25, 2004, Buford picked up L.R. at her home[1] for the ostensible purpose of taking her to the movies. He was driving a white Chevrolet Malibu. Curry, whom L.R. knew through Buford as 'Pacman,' was sitting in the backseat. Buford picked up Russell, who joined Curry in the backseat, then drove to a liquor store. After Buford, Curry and Russell bought liquor, everyone changed seats. Russell drove with Curry beside her. Buford and L.R. were in the backseat. Instead of going to the movies, defendants drove L.R. to a park in Elk Grove.[2]

". . . Eventually, L.R. told Buford she wanted to go home and he agreed to drive her back. Buford had his arm around L.R.'s waist, but turned sideways as they walked.

"When Buford gave the signal, Boone and Russell ran in front of him and L.R., turned, and Boone sprayed L.R. in the face with mace. Boone also hit L.R. in the face. L.R. tried to fight back but was blinded by the mace. Russell joined the fray and punched L.R. in the face. L.R. fell to the ground. L.R. told her attackers that she was pregnant. When L.R. asked Buford for help, he responded, '[J]ust fight back.'

"The attack continued while L.R. was on the ground. Curry kicked her in the side. He also threw a garbage can at L.R., hitting her in the head. Boone removed L.R.'s tennis shoes and someone took her cell phone. At that point, Boone and Russell left in

---

**1**     Later in the opinion, *Curry* notes that the victim's home was in Sacramento County. (*Curry, supra*, 158 Cal.App.4th at p. 776.)

**2**     The park is in Sacramento County, where Buford and his coconspirators were tried.

3

the Malibu by themselves. They drove north on Interstate 5 toward Meadowview where Russell's grandmother lived.

"Back at the park, L.R. asked Buford to call an ambulance and he said, 'Okay.' However, instead of calling the ambulance, Buford called Boone and told her to 'come back and finish the job.' Boone asked Buford if he was trying to kill L.R., and Buford said, '[N]o, just the baby.' He wanted Boone to continue, 'as long as that baby gets up out of her.' While Russell and Boone were driving back to the park, Buford called again to tell them to bring a baseball bat and flashlight from the car.

"Boone and Russell approached L.R. at the park carrying a flashlight and baseball bat. Boone struck L.R.'s leg with the bat and Russell hit her in the head with the flashlight. The women told L.R. that Buford was not the father of her baby and he was not going to pay child support. L.R. named someone else as the baby's father because she wanted the beating to stop.

"Boone testified that while Russell and L.R. continued to fight, Curry hit L.R. in the head, knocking her to the ground. Boone also stated that Curry kicked L.R. with both feet as she lay on the ground saying, 'Help me, my baby.' L.R. lost consciousness while she was on the ground." (*Curry*, *supra*, 158 Cal.App.4th at pp. 773-774.)

"Doctors treated L.R. for a fractured eye socket and extensive bleeding inside the eye. She was still experiencing double vision at the time of trial. The doctors drained blood from both of L.R.'s swollen ears. They noticed abrasions on L.R.'s face, abdomen and buttocks, and bruises all over her body. [¶] Fetal heart monitors indicated that L.R.'s unborn baby was in distress and not receiving enough oxygen. L.R. was nearly 32 weeks pregnant at the time of the assault and had not experienced any problems with her pregnancy. Doctors delivered the baby by emergency Cesarean section. The baby had an initial Apgar score of 1 on a scale of 1 to 10. A normal baby has an initial Apgar score of 7 or 8. Doctors placed the baby on a mechanical ventilator for 48 hours and supplied

4

oxygen through its nasal passages for another five days.  The baby remained in the hospital for three weeks."  (*Curry*, *supra*, 158 Cal.App.4th at pp. 775-776.)

In Sacramento County Superior Court, Buford was charged and convicted of attempted premeditated murder of " 'Baby Doe,' " a seven-month-old fetus (Pen. Code, §§ 664 & 187), assault with a deadly weapon by means of force likely to cause great bodily injury (*id*., § 245, subd. (a)(1)), second degree robbery (*id*., § 211), aggravated kidnapping (*id*., § 209, subd. (b)(1)), attempted robbery (*id*., §§ 664 & 211), and conspiracy to murder a human fetus (*id*., §§ 182, subd. (a)(1) & 187, subd. (a)).  (*Curry*, *supra*, 158 Cal.App.4th at p. 772.)  Buford was sentenced to life in prison for the aggravated kidnapping, a consecutive term of 25 years to life for conspiracy to commit murder, and a consecutive 5 years for robbery.  (*Ibid.*)

Buford appealed his conviction and was represented on appeal by legal counsel under appointment of this court.  (*Curry*, *supra*, 158 Cal.App.4th at pp. 771-772.)  This court affirmed the convictions of Buford and his co-appellants.  (*Id.* at p. 795.)  Thereafter, Buford represented himself in seeking habeas corpus relief in federal district court.  (*Buford v. Yates* (E.D. Cal. 2010) 2010 WL 4983388, *1.)  The federal district court rejected the habeas corpus petition, including challenges to the sufficiency of the evidence.  (*Id.* at pp. *6, *20.)

Sometime between 2012 and 2013, Buford submitted a request for resentencing in Sacramento County Superior Court.  In March 2017, Buford submitted a civil claim against court clerks and other court-connected personnel to the Sacramento County Board of Supervisors.  The Board of Supervisors rejected the claim as untimely.  In September 2017, Buford "submitted a request" in the Sacramento County Superior Court "in order to prepare for future youth offender parole hearing(s) and collateral challenges to his criminal conviction(s) or sentence(s) in the trial court."  After Buford submitted a second request for "the record on appeal/trial transcripts," he submitted "a peremptory challenge

against the trial court."  A request for leave to file a late claim was filed in Sacramento County Superior Court in August 2018.  The request to file a late claim was denied.

### *In Yolo County*

In April 2018, Buford filed a civil complaint in Yolo County Superior Court for fraud and professional negligence.  Buford named as defendants:  the County of Sacramento, the Sacramento County Superior Court's office of the clerk, Michelle Jeremiah (apparently in her capacity as Sacramento County Superior Court supervising courtroom clerk), and Valerie Green (apparently in her capacity as Sacramento County Superior Court deputy clerk).  Buford alleged that Yolo County was the proper court because of "[c]onflict of interest prevents filing in county where injury occurred (Sacramento) when Defendants would be responsible for filing and adjudicating these claims."  Buford's complaint alleged facts occurring only in Sacramento County.

Buford and defendants' legal counsel exchanged correspondence in which defendants' legal counsel proposed that Buford dismiss the County of Sacramento as a defendant in return for the remaining defendants' withdrawal of their motion to transfer venue.  Buford then moved to dismiss the County of Sacramento as a defendant in his Yolo County civil action.  The remaining defendants demurred.  Although the remaining defendants asserted defenses of failure to comply with the Government Claims Act (Gov. Code, § 810 et seq.) and quasi-judicial immunity, they did not mention subject matter jurisdiction.

The trial court issued a tentative ruling that dropped the demurrer from calendar because the notice of motion was unsigned.  The parties, however, appeared to agree to have the trial court determine the demurrer on the merits.  Thus, the trial court heard the matter.  On May 20, 2019, the trial court issued an order sustaining the demurrer without leave to amend.  On May 30, 2019, the trial court entered a judgment of dismissal. Buford filed a notice of appeal on May 28, 2019.

6

For reasons that are not clear from the record, the Appellate Division of the Yolo County Superior Court appears to have initially assumed jurisdiction over the appeal.**3** In December 2021, this court ordered the appeal transferred from the Yolo County Superior Court. Having transferred the appeal to this court, we proceed in reviewing the judgment of dismissal.

## DISCUSSION

### *Subject Matter Jurisdiction*

The remaining defendants argue that the Yolo County Superior Court lacked subject matter jurisdiction to review the actions taken by the Sacramento County Superior Court. We agree.

A bedrock rule of our judicial system is that a court must have subject matter jurisdiction to hear a case. "Subject matter jurisdiction is a fundamental requirement for judicial consideration of claims. 'The California Supreme Court has defined subject matter jurisdiction . . . : "Subject matter jurisdiction . . . is the power of the court over a cause of action or to act in a particular way." [Citations.] By contrast, the lack of subject matter jurisdiction means the entire absence of power to hear or determine a case; i.e., an absence of authority over the subject matter. [Citations.] Where the evidence is not in dispute, a determination of subject matter jurisdiction is a legal question subject to de novo review.' (*Dial 800 v. Fesbinder* (2004) 118 Cal.App.4th 32, 42.) Subject matter jurisdiction may not be ' " 'conferred by consent, waiver, agreement, acquiescence, or estoppel.' " [Citation.]' (*Totten* [*v. Hill* (2007)] 154 Cal.App.4th [40,] 47.) As noted

---

**3** Buford's notice of appeal expressed uncertainty over which court should hear his appeal and therefore appealed to "either [the Yolo County Superior] Court or the Third Appellate District Court." Under the California Rules of Court, rule 8.100(a)(2), however, the notice of appeal "need *not* specify the court to which the appeal is taken; the appeal *will be treated as taken to the Court of Appeal* for the district in which the superior court is located." (Italics added.)

7

above, ' "[t]he adequacy of the court's subject matter jurisdiction must be addressed whenever that issue comes to the court's attention." [Citation.]' (*Id*. at p. 46; see *In re Gloria A*. [(2013)] 213 Cal.App.4th [476,] 481.)  Thus, it may be considered for the first time on appeal (*People v. Lara* (2010) 48 Cal.4th 216, 225 (*Lara*)), and requires no particular procedural vehicle.  (*Great Western Casinos, Inc. v. Morongo Band of Mission Indians* (1999) 74 Cal.App.4th 1407, 1417-1418.)  '[A]ny judgment or order rendered by a court lacking subject matter jurisdiction is "void on its face . . ." [Citation.]' (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 196 (*Varian*).)" (*Saffer v. JP Morgan Chase Bank, N.A.* (2014) 225 Cal.App.4th 1239, 1248.)

As a matter of basic constitutional law, a forum court must have some minimum contacts, ties, or relations with the parties and the acts addressed by the complaint. (*Burger King Corp. v. Rudzewicz* (1985) 471 U.S. 462, 471-472.)  In this case, Buford's complaint alleges *no* events that occurred in Yolo County or that any of the parties have even the slightest tie to Yolo County.  Indeed, Buford seems to have sought out Yolo County as a forum precisely because it had no ties to the events or parties described in his complaint.  Consequently, Yolo County had no constitutionally sufficient basis for assuming jurisdiction over this case.  (*Ibid.*)

Moreover, Yolo County could not assume subject matter jurisdiction after the Sacramento County Superior Court exercised jurisdiction by taking the very actions for which Buford sought civil remedies.  "[B]etween superior courts of different counties, having coequal jurisdiction over a matter, the first court of equal dignity to assume and exercise jurisdiction over a matter acquires *exclusive* jurisdiction." (*Ford v. Superior Court* (1986) 188 Cal.App.3d 737, 742, italics added; accord *Morrisette v. Superior Court* (1965) 236 Cal.App.2d 597, 599-600 (*Morrisette*).)  Thus, even if Yolo County could somehow have assumed original jurisdiction, it was barred from adjudicating Buford's complaint after Sacramento County Superior Court ruled on the requests forming Buford's basis for complaint.

8

The parties' stipulation to adjudicate the demurrer in Yolo County after Buford's dismissal of the County of Sacramento did not remedy Yolo County Superior Court's lack of subject matter jurisdiction. Subject matter jurisdiction cannot be manufactured by consent of the parties. " '[W]here a court is wholly lacking in jurisdiction of the subject matter of an action, jurisdiction may not be conferred by consent, waiver, agreement, acquiescence, or estoppel. [Citations.]' " (*Chromy v. Lawrance* (1991) 233 Cal.App.3d 1521, 1524, quoting *Schlyen v. Schlyen* (1954) 43 Cal.2d 361, 375-376.) Regardless the wishes of parties to an action, they cannot litigate in a court that lacks subject matter jurisdiction.

Yolo County Superior Court's ruling on Buford's demurrer could have created a conflict between two superior courts. "[I]t is unthinkable in a unified jurisdiction, such as our state, that the same essential controversy for the creation of a status should be heard and determined in two different courts at the same time. One or the other must yield precedence, or the possibility would exist that the courts might arrive at exactly opposite determinations." (*Morrisette, supra*, 236 Cal.App.2d at p. 599.) Indeed, one department of a superior court cannot review the rulings of another department of the *same* superior court. Even that would result in "conflicting adjudications of the same subject-matter" that " 'would bring about an anomalous situation and doubtless lead to much confusion.' " (*Ford v. Superior Court, supra*, 188 Cal.App.3d at p. 742, quoting *In re Kowalski* (1971) 21 Cal.App.3d 67, 70.)

Our conclusion that the Yolo County Superior Court lacked subject matter jurisdiction requires us to correct the judgment of dismissal, which is predicated on lack of merit of the Buford's complaint. "[A] dismissal on the merits cannot be affirmed on appeal if the trial court did not have jurisdiction over the subject matter of the action; instead, the judgment of dismissal must be vacated." (*Lockwood v. Sheppard, Mullin, Richter & Hampton* (2009) 173 Cal.App.4th 675, 682.)

9

## DISPOSITION

The judgment is vacated.  On remand, the Yolo County Superior Court is directed to dismiss the matter for lack of subject matter jurisdiction.  Defendants shall recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (5).)


                 /s/
                 HOCH, J.


We concur:


 /s/
BLEASE, Acting P. J.


 /s/
ROBIE, J.