[No. D040158. Fourth Dist., Div. One. Nov. 26, 2002.]

WARBURTON/BUTTNER, Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
TUNICA-BILOXI TRIBE OF LOUISIANA, Real Party in Interest.

## COUNSEL

Carlsmith Ball and Albert H. Ebright for Petitioner.

Fox, Johns, Lazar, Pekin & Wexler, George C. Lazar, Michael H. Wexler; and Donald Juneau for Real Party in Interest.

## OPINION

**HUFFMAN, J.**—In this petition for writ of mandate brought by Warburton/Buttner, a limited partnership that develops and manages commercial real estate on Indian land (Warburton), significant issues are raised concerning the showing required to establish an express authorization of an Indian tribe's waiver of its sovereign immunity from suit. In addition to the defendant and real party in interest, the Tunica-Biloxi Tribe of Louisiana (the Tribe), Warburton's action for breach of contract and fraudulent or negligent misrepresentation names as a defendant a limited liability company of which the Tribe is a member, First Nation Gaming, LLC (First Nation), and makes alter ego allegations about First Nation and the Tribe. The petition arises out of the trial court's denial of Warburton's motions to compel discovery of information from the Tribe regarding subject matter jurisdiction issues in connection with Warburton's efforts to prepare opposition to a pending motion for summary judgment brought by the Tribe on the sovereign immunity issue. (Code Civ. Proc., § 437c.)[1]

The challenged order denying the motions to compel discovery made findings that the Tribe had not effectively waived its right to sovereign immunity, and further, that any order of the court as requested by Warburton in this discovery motion would be void for lack of subject matter jurisdiction. Thus, the order denying the requested discovery also served to grant the Tribe's summary judgment motion in advance of its scheduled hearing date, and without allowing any opposition.

In opposition to the petition for writ of mandate, the Tribe has filed an answer and a motion to dismiss, again asserting a lack of subject matter jurisdiction in the California courts of Warburton's action for breach of contract and misrepresentation, due to sovereign immunity of the Tribe that was not properly or adequately waived. As we will show, the motion to dismiss presents the same questions as the petition. We find the trial court's ruling was both substantively and procedurally flawed, and we grant the petition with directions, first, to allow the requested discovery regarding subject matter jurisdiction to proceed, and second, to allow the Tribe to renotice its motion for summary judgment on the jurisdictional question, if it wishes to do so. Depending upon the outcome of those proceedings, the trial court must determine if the related discovery on the merits of the allegations must also be permitted and reschedule the trial date accordingly.

[1]All statutory references are to this code unless otherwise stated.

FACTUAL AND PROCEDURAL BACKGROUND

Warburton's allegations of breach of contract and misrepresentations arise out of an Agreement entered into October 4, 1999, between Warburton, First Nation, and the Tribe (the Agreement), pursuant to which Warburton referred certain gaming opportunities with designated Indian tribes to First Nation. These gaming opportunities are projects involving the planning, creation and operation of casinos and related facilities. First Nation is a Delaware limited liability company of which the Tribe is a member, owning 51 percent as of the time of the filing of the complaint. (See Corp. Code, § 17000 et seq., similar California law governing limited liability companies.) In return for these referrals, First Nation agreed to pay Warburton a flat fee per project and 10 percent of gross management fees. The Agreement provided that it was to be governed by the laws of the state of California and contained the following language regarding tribal sovereign immunity: "Because it may be determined by a court of competent jurisdiction that First Nation is a tribally controlled entity, Tunica-Biloxi hereby agrees that it will not assert its tribal immunity in any action brought by [Warburton] to enforce any or all provisions of this agreement."

The Agreement, as executed by the three parties, Warburton, First Nation, and the Tribe, shows there was originally another related provision that was stricken out by interlineation, as follows: "The Tunica-Biloxi Tribal Resolution waiving its sovereign immunity in any action brought by [Warburton] against First Nation is attached hereto as Addendum 'A'." It is not disputed that no such addendum was ever executed or attached, although it is heavily disputed whether the parties mutually intended that this be done. The Agreement, paragraph 7.2, further states that it is not "intended as an admission by [Warburton] that First Nation enjoys the Tunica-Biloxi Tribe's sovereign immunity."

The Agreement was signed on behalf of the Tribe by the tribal council chairman, Earl J. Barbry, Sr., in the presence of four of the other six tribal council members: Marshall Pierite, Alfred Barbre, Harold Pierite and David Rivas, Jr. The signing took place in a meeting room at the casino (the Hall of the Chiefs), as opposed to the tribal council chamber at which tribal council meetings were ordinarily held.

Disputes arose about the performance of the Agreement and in August 2001, Warburton filed this complaint for damages for breach of contract, fraud, negligent misrepresentation and an accounting. The Agreement was attached as an exhibit to the complaint. The complaint makes allegations that the Tribe was an alter ego of First Nation, in that the Tribe managed and controlled it, it was undercapitalized, monies were commingled between the Tribe and First Nation, and necessary corporate formalities were not observed.

In January 2002, the Tribe brought a demurrer and motion to dismiss based on lack of subject matter jurisdiction, due to the lack of a tribal resolution expressly waiving sovereign immunity. The Tribe's points and authorities acknowledge the waiver paragraph was conditional and the stated condition was unclear (whether the Tribe was precluded from raising sovereign immunity only if a court found First Nation to be tribally controlled). The declaration of the tribal council member who was the custodian of records, and who was present at the signing of the Agreement, stated there was no such resolution and the chairman was not authorized to waive sovereign immunity by signing the Agreement. No information is included about the procedures for calling a noticed meeting of the tribal council and whether such notice could be waived by the participants, if sufficient in number.

In opposition to the motion to dismiss, Warburton submitted its representative Hank Quevedo's declaration, giving his account of the signing of the Agreement in the presence of five members of the seven-person tribal council. Quevedo's declaration stated that all those present went through the Agreement reading each paragraph out loud, and he explained that the reason the second sentence of paragraph 7.2 was stricken was because the resolution waiving sovereign immunity was not ready and therefore could not be attached as an exhibit to the Agreement. Quevedo suggested at the time that since the majority of the tribal council was present, Chairman Barbry could ask for the resolution at the meeting, but the chairman told him he would have to call a formally noticed meeting of the tribal council to do so, "but not to worry about it and that it would be taken care of soon." None of the tribal council members present objected. Quevedo asked chairman Barbry about the resolution four or five times, and was told it would be taken care of, but this never occurred.

The trial court (Judge Zvetina, who has since retired) overruled the demurrer and denied the motion to dismiss, and the order stated, "There is a factual issue raised by the presence of the majority of the Tribal Members [Council] at the execution of the agreement in determining whether a formal resolution was required in order to find a waiver of sovereign immunity." The Tribe then filed its answer, asserting a number of affirmative defenses relating to excuse from or prevention of performance, among others, and reiterating its objection to subject matter jurisdiction.[2]

Warburton served a total of seven discovery requests on the Tribe. The first four discovery requests were directed to the issue of sovereign immunity, and sought information about the circumstances of the signing of the

---

[2]The filing of an answer did not constitute a waiver of the subject matter jurisdiction argument, which the Tribe has continually asserted. (*Great Western Casinos, Inc. v. Morongo Band of Mission Indians* (1999) 74 Cal.App.4th 1407, 1418-1419, fn. 2 [88 Cal.Rptr.2d 828] (*Great Western Casinos*).)

Agreement on October 4, 1999, and events related thereto, and production of documents such as resolutions, ordinances, delegations of authority or other documents pertaining to the waiver of sovereign immunity. In addition, Warburton served requests for admission relating to the authority of the chairman of the Tribe to sign the October 4, 1999 Agreement. Warburton also served notices of deposition of the tribal council members present at the signing of the Warburton/First Nation/Tribe Agreement. The next three discovery requests pertained to nonjurisdictional issues, about the circumstances and events related to the negotiation and performance of the Agreement and its alleged breach, and any documents supporting the affirmative defenses pled in the Tribe's answer.

In April 2002, the Tribe served partial answers and objections to the discovery requests. The Tribe did not respond to the requests for admission, which Warburton interpreted as entitling it to an order that the truth of the matters requested therein be deemed admitted. (§ 2033, subd. (k).) In the Tribe's view, it gratuitously provided certain information, such as the affidavits of the tribal council members present at the signing of the Warburton/First Nation/Tribe Agreement, stating that no tribal resolution was ever passed concerning the Agreement, and Petitioner was entitled to no more discovery.

In March 2002, the Tribe filed a motion for summary judgment on the ground of sovereign immunity. It was supported by the affidavits of the tribal council members who had been present at the signing of the Agreement. The Tribe's points and authorities for both the dismissal motion and the summary judgment motion refer to the text of the 1999 Tribal Constitution, article IV, "Sovereignty," as follows: "The sovereignty of the [Tribe] is its most sacred possession and birthright. Nothing in this Constitution shall be deemed or construed to be a waiver of the sovereign immunity of the Tribe. Sovereign immunity may be waived only by express resolution enacted by a majority vote of the Tribal Council, and only to the extent specified in such resolution. Before such resolution is enacted, the Tribal Council will seek the advice of legal counsel."

The summary judgment hearing date was continued by stipulation. Meanwhile, Warburton filed and obtained a hearing date for its motions to compel discovery, later continued by stipulation. In opposition to the discovery motions, and shortly before their hearing date, the Tribe filed a document entitled, "Motion to Limit Discovery, Set Aside Stipulation, Quash Notices of Deposition and Proceed to Determine Motion for Summary Judgment Filed by Tribe." Warburton filed opposition, contending that this new motion was untimely (six days' notice given as opposed to the required 26 days). This opposition pointed out to the court that the Tribe's codefendant, First Nation, was originally owned 51 percent by the Tribe, but that the

Tribe now represents that it owns 100 percent of First Nation as of the time of these proceedings.

At the hearing date on the discovery motions, the respondent court ruled that the Tribe had not waived its right to sovereign immunity, such that any order of the court as requested by Warburton in this motion would be void for lack of subject matter jurisdiction. In relevant part, it reasoned that the Tribe voluntarily provided information "to confirm for Plaintiff Warburton that the Tribal Council never passed a resolution affirming or approving the October 4, 1999, agreement," as shown by the affidavits of which the court took judicial notice, as previously filed with the moving papers for the Tribe's motion for summary judgment. The court made a factual finding that the Tribe had adopted a constitution stating that sovereign immunity may be waived only by express resolution, only to the extent specified in such resolution, and legal counsel would be sought before such a waiver. (The Indian Reorganization Act of 1934, 25 U.S.C. §§ 476, 477.) The trial court found there was no conflict between paragraph 7.1 of the Agreement, which specifies the liability of the Tribe in terms of its submission to California law, and paragraph 7.2, dealing with the Tribe's waiver of sovereign immunity as to Warburton.[3]

With respect to the extrinsic evidence presented (the affidavits by the tribal council members), the court found they were relevant to prove a meaning to which the language of the instrument was reasonably susceptible (citing *Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373]). Accordingly, the court made these factual findings:

"1) The agreement had printed language lined out deleting the waiver of sovereign immunity,

"2) The Chairman only signed the agreement,

"3) The Chairman had an available quorum or majority to call into session to pass a resolution to waive the Tribe's immunity, but he did not call them into session and were not present in the Tribal Council Chamber versus were present in the Hall of the Chiefs, and,

"4) No resolution waiving or ratifying waiver of sovereign immunity as to WB [Warburton] was ever passed as verified by a review of the records of the Tribal Council's actions, including resolutions, ordinances, codes and other legislation as well as minutes of the Council's proceedings, by the Council's custodian of such records (Marshall Pierite)."

---

[3]Paragraph 7.1 of the Agreement states that it is binding upon the parties and their successors and assigns, and it is entered into and governed by the internal laws of the State of California, with venue for any disputes to be in San Diego, California. It also contains an integration clause and requires any amendments to be in writing signed by all the parties.

The trial court also found probative the evidence supplied by the Tribe concerning a number of other tribal resolutions in which the tribal chairman was expressly authorized to execute agreements wherein the Tribe expressly waived its sovereign immunity as to other parties related to the transaction, as supporting a finding of the intent of the Tribe not to waive its sovereign immunity as to Warburton.

The trial court noted further that although the Tribe was vigorously asserting its own sovereign immunity, this did not appear to be true as to the tribally controlled entity First Nation. Thus, the trial court order stated, "The Tribe in the October 4, 1999, agreement does bind itself not to assert its sovereign immunity bar in an action by [Warburton] against First Nation . . . even though the Tribe is a member of First Nation . . . ." Finally, the court ruled that there were no remaining causes of action as to which subject matter jurisdiction would be proper, so as to require the requested discovery to be performed. The trial court accordingly denied the motions to compel discovery, and at the oral argument on the motions, set a trial date as to the remaining defendant First Nation (Nov. 8, 2002).

This petition for writ of mandate followed. We entered an order on June 6, 2002 summarily denying the petition. After granting a petition for review, the Supreme Court returned the case to this court and stayed all proceedings in the trial court, pending further action by this court. We issued an alternative writ and held oral argument on both the petition and the Tribe's motion to dismiss filed in response to it.[4]

## DISCUSSION

Warburton challenges the trial court's ruling denying the requested discovery on the immunity/jurisdictional issue, asserting both substantive and procedural objections. The procedural arguments concern its need for discovery in order to prepare opposition to the pending summary judgment motion on the jurisdictional issue, and the trial court's shortcutting of all the pending motions by making a finding of lack of subject matter jurisdiction before allowing discovery, effectively terminating the case as to the Tribe, in its favor, based only on evidence voluntarily given by the Tribe. (§§ 437c, 2019.)

While these procedural problems raise serious concerns about the fairness of these motion proceedings, the fundamental question presented is whether Warburton is justified in contending that it has a substantive entitlement to

---

[4]While this matter was awaiting oral argument, the Tribe filed, in addition to its motion to dismiss, a motion to remand the case with instructions to dismiss the action, on the basis that if the Tribe is dismissed from the action, all indispensable parties will not be before the court, due to the Warburton allegations that First Nation is merely a straw corporation or an alter ego of the Tribe. We denied that motion prior to the oral argument held on the other matters.

discovery about the circumstances and events surrounding the entry into the Agreement by the Tribe, and its performance of it, as well as the alter ego issues presented about First Nation in the complaint, as they affect the jurisdiction and sovereign immunity issues. As instructed by the Supreme Court, we have issued an alternative writ and set the matter for hearing, and now set forth our analysis of the subject petition, which will in turn dispose of the responsive motion to dismiss.

I

*Standard of Review*

■ Generally speaking, the issue of whether a court has subject matter jurisdiction over an action against an Indian tribe is a question of law subject to de novo review. (*Tamiami Partners v. Miccosukee Tribe of Indians* (11th Cir. 1999) 177 F.3d 1212, 1224.) ■ Similarly, the interpretation and construction of a written instrument, such as the Agreement here, may be conducted de novo where "(a) the trial court's contractual interpretation is based solely upon the terms of the written instrument without the aid of extrinsic evidence; (b) there is no conflict in the properly admitted extrinsic evidence; or (c) the trial court's determination was made on the basis of improperly admitted incompetent evidence. [Citation.]" (*Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 913 [75 Cal.Rptr.2d 573], italics omitted, citing *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].) "By the same token, however, where the interpretation of the contract turns upon the credibility of conflicting extrinsic evidence which was properly admitted at trial, an appellate court will uphold any reasonable construction of the contract by the trial court. [Citation.]" (*Morey v. Vannucci, supra,* 64 Cal.App.4th at p. 913.) When construing contracts, the courts will look for the expressed intent of the parties, under an objective standard. (*Brant v. California Dairies* (1935) 4 Cal.2d 128, 133 [48 P.2d 13]; 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 684, p. 617.)

In the case before us, the application of these rules is complicated by the fact that this is a discovery writ concerning factual issues that allegedly affect the subject matter jurisdiction issue of law. Specifically, Warburton is contending that numerous triable issues of material fact exist on the sovereign immunity issue, including the intent of the parties in signing the Agreement, ratification of the Agreement through performance by the Tribe, alter ego issues concerning the Tribe and its wholly owned entity, First Nation, and whether the tribe should be estopped from contending that it did not approve the Agreement. ■ An appellate court's review of the trial court's construction of allegedly ambiguous contractual language depends

on the circumstances. (*Appleton v. Waessil* (1994) 27 Cal.App.4th 551, 556 [32 Cal.Rptr.2d 676].) Where there is conflicting parol evidence that requires a resolution of credibility issues, the appellate court will be guided by the substantial evidence test. (*Ibid.*) In this case, Warburton seeks discovery of information about the circumstances of signing and performance of the Agreement to support its showing of conflicting parol evidence on the jurisdictional issue.

■ California law permits a plaintiff seeking to assert claims against a corporation to obtain discovery against it about whether it has been doing business in this state, since such facts are normally within the knowledge of the corporate officers and such jurisdictional issues are subject to discovery. (*1880 Corp. v. Superior Court* (1962) 57 Cal.2d 840, 843 [22 Cal.Rptr. 209, 371 P.2d 985].) ■ Further, the California courts have adopted the federal procedural approach to this specific type of jurisdictional problem, involving discovery, by allowing a trial court faced with a claim of sovereign immunity to " 'engage in sufficient pretrial factual and legal determinations to " 'satisfy itself of its authority to hear the case' before trial." ' " (*Great Western Casinos, supra,* 74 Cal.App.4th 1407, 1418, citing *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan* (D.C. Cir. 1997) 115 F.3d 1020, 1027-1028; *Smith v. Hopland Band of Pomo Indians* (2002) 95 Cal.App.4th 1, 7, fn. 8 [115 Cal.Rptr.2d 455] (*Smith*).) The reason for this rule is that the lack of subject matter jurisdiction can be raised at any time, and no specific procedural method is required to bring the matter to the court's attention. (*Great Western Casinos, supra,* 74 Cal.App.4th at p. 1418; see *Gould, Inc. v. Pechiney Ugine Kuhlmann* (6th Cir. 1988) 853 F.2d 445, 451 [where sovereign immunity issues are presented, putting subject matter jurisdiction into question, "discovery and fact-finding should be limited to the essentials necessary to determining the preliminary question of jurisdiction"].) Thus, a court considering a jurisdictional question regarding sovereign immunity may go beyond the pleadings and contract language to consider testimonial and documentary evidence relevant to that issue. (*Great Western Casinos, supra,* 74 Cal.App.4th at p. 1418; *Smith, supra,* 95 Cal.App.4th at p. 7, fn. 8.)

■ If an appellate court is presented with a case in which the facts most relevant to the appeal are undisputed, it may resolve the question of law presented without regard to the findings of the trial court. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799 [35 Cal.Rptr.2d 418, 883 P.2d 960].) However, by the same token, it may be necessary to determine the historical facts of a transaction in order to apply the pertinent legal principles. (*Id.* at pp. 800-801.)

In the case before us, the application of these rules clearly indicates that the trial court was justified in considering the tribal council member's

affidavits in ruling on the jurisdictional question. However, we will next analyze the rules for asserting sovereign immunity in the Indian tribal context in order to determine if Warburton should have been allowed discovery in order to prepare an opposing showing on that issue.

## II

*Standards for Assertion of Sovereign Immunity*

### A

*Introduction*

■ A valuable introduction to the rules in this area is provided in *E.F.W. v. St. Stephen's Indian High School* (10th Cir. 2001) 264 F.3d 1297, 1304: " 'Indian tribes are domestic dependent nations that exercise inherent sovereign authority over their members and territories. As an aspect of this sovereign immunity, suits against tribes are barred in the absence of an unequivocally expressed waiver by the tribe or abrogation by Congress.' [Citation.] . . . [¶] 'It is settled that a waiver of sovereign immunity cannot be implied but must be unequivocally expressed.' *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58, 98 S.Ct. 1670, [1677,] 56 L.Ed.2d 106 (1978) (internal quotations omitted)."

It must be recognized that "sovereign immunity is not a discretionary doctrine that may be applied as a remedy depending on the equities of a given situation. [Citation.]" (*Chemehuevi Ind. Tribe v. Cal. St. Bd. of Equal.* (9th Cir. 1985) 757 F.2d 1047, 1052-1053, fn. 6, revd. in other part in *Cal. Bd. of Equalization v. Chemehuevi Tribe* (1985) 474 U.S. 9 [106 S.Ct. 289, 88 L.Ed.2d 9].) Rather, it presents a pure jurisdictional question. (*Chemehuevi Ind. Tribe v. Cal. St. Bd. of Equal., supra,* 757 F.2d at p. 1051; see also *Ute Distributing Corp. v. Ute Indian Tribe* (10th Cir. 1998) 149 F.3d 1260, 1267 [the requirement that a waiver of tribal immunity must be clear and express is not a doctrine that may be flexibly applied or disregarded based upon the particular facts].)

In *Trudgeon v. Fantasy Springs Casino* (1999) 71 Cal.App.4th 632 [84 Cal.Rptr.2d 65], the Court of Appeal addressed the applicability of sovereign immunity to a tort case against a separate business entity organized by an Indian tribe, as opposed to immunity from a tort claim against the tribe itself. ■ The court noted that other jurisdictions have reached varying conclusions in considering whether sovereign immunity applies to tribal business entities. (*Id.* at pp. 638-643.) It then applied a three-part test setting forth the relevant criteria to address the immunity issue, including these considerations: " '1) whether the business entity is organized for a purpose that is

governmental in nature, rather than commercial; [¶] 2) whether the tribe and the business entity are closely linked in governing structure and other characteristics; and [¶] 3) whether federal policies intended to promote Indian tribal autonomy are furthered by the extension of immunity to the business entity.' [Citation.]" (*Id.* at p. 638; also see *Redding Rancheria v. Superior Court* (2001) 88 Cal.App.4th 384, 388-389 [105 Cal.Rptr.2d 773].) Essentially, Warburton appears to be raising similar issues in its alter ego claims. (Also see *Ute Distribution Corp. v. Ute Indian Tribe, supra,* 149 F.3d 1260, 1269 [remanding a case dealing with water rights to the district court because it had not been determined whether the Ute Tribe as constitutional organization or the Ute Tribe as a federal corporation was the proper defendant here, for purposes of interpreting a waiver of sovereign immunity].)

As explained in the American Indian Law Deskbook (2d ed. 2000) Conference of Western Attorneys General, chapter 7, section B, pages 171 through 174 (Deskbook), the issue of a waiver by an Indian tribe of its sovereign immunity from suit has arisen in three general contexts, the first of which is the effect of provisions in individual contracts, such as arbitration clauses. The leading case of *C & L Enterprises, Inc. v. Citizen Band Potawatomi Indian Tribe of Okla.* (2001) 532 U.S. 411 [121 S.Ct. 1589, 149 L.Ed.2d 623] (*C & L*), which we next discuss, deals with the effect of such a contractual clause. Another form of conduct that may give rise to waiver issues is an Indian tribe's taking of certain legal positions during litigation (e.g., raising counterclaims or intervening in litigation). (Deskbook, *supra,* at p. 173.) The authors continue, "The final context is the most complicated and turns on whether the tribal defendant was acting in a sovereign or a corporate status at the time the controversy arose. This complexity derives in large part from sections 16 and 17 of the Indian Reorganization Act [25 U.S.C. §§ 476, 477], which authorize tribes . . . to adopt, respectively, constitutions for their internal governance and charters of incorporation for entities whose purpose is to acquire property or engage in commercial enterprises. The latter's charters frequently have 'sue and be sued' provisions to facilitate involvement in commerce." (*Id.* at pp. 173-174, fns. omitted.) The authors note that a substantial amount of litigation has focused on the difference between incorporation and chartering of such entities. (*Id.* at p. 175.) This type of distinction was explained in *Linneen v. Gila River Indian Community* (9th Cir. 2002) 276 F.3d 489, 492-493 (*Linneen*), in which a tribe's corporate charter contained a "sue and be sued" clause, which waived immunity with respect to a tribe's corporate activities, but not with respect to its governmental activities: "The Indian Reorganization Act, 25 U.S.C. § 476, authorizes Indian tribes to organize as a constitutional entity, and § 477 of the Act authorizes organization of a corporate entity. [Citation.] Most courts that have considered the issue have recognized the

distinctness of these two entities. [Citation.] The 'sue and be sued' clause in the [Indian] Community's corporate charter in no way affects the sovereign immunity of the Community as a constitutional, or governmental, entity." (*Linneen, supra,* 276 F.3d at pp. 492-493.) Thus, the relevant immunity question should be whether the alleged actions that form the basis of a particular suit are clearly governmental rather than corporate in nature. (*Ibid.*)

Although the trial court's order made passing reference to this issue and *Linneen, supra,* 276 F.3d 489, this distinction between a tribe's governmental or corporate activities has not been well briefed by the parties in this case, and it is unclear at this point whether it may prove to be relevant in the subject discovery efforts regarding the jurisdictional questions.

## B

### Contentions and Case Law

In this case, there is no contention of any congressional abrogation of the Tribe's sovereign immunity; rather, Warburton argues there was an explicit or express waiver of immunity by the Tribe in the form of some or all of the Agreement's provisions that (1) the Agreement was to be governed by the laws of the state of California; (2) the following language regarding tribal sovereign immunity was an express waiver of immunity: "Because it may be determined by a court of competent jurisdiction that First Nation is a tribally controlled entity, Tunica Biloxi hereby agrees that it will not assert its Tribal Immunity in any action brought by [Warburton] to enforce any or all provisions of this agreement;" further, (3) the Agreement admittedly contained a related provision that was stricken out by interlineation, as follows: "The Tunica-Biloxi Tribal Resolution waiving its sovereign immunity in any action brought by [Warburton] against First Nation is attached hereto as Addendum 'A' "; however, it is Warburton's claim that the parties mutually intended that this be done later because the document was not ready then; and (4) the Agreement, paragraph 7.2, further states that it is not "intended as an admission by [Warburton] that First Nation enjoys the . . . Tribe's sovereign immunity," thus showing the anticipated separateness of First Nation and the Tribe, that was allegedly fraudulently disregarded, giving rise to the alter ego allegations. Warburton contends that it is entitled to discovery concerning the Tribe's execution and performance of the Agreement, allegedly ratifying the Agreement, in order to confirm and support its reading of the Agreement itself.

To evaluate these arguments, we turn to *C & L, supra,* 532 U.S. 411, in which the United States Supreme Court found that a tribe had waived, with the requisite clarity, immunity from the suit a construction company (C & L)

brought to enforce its arbitration award, through the construction contract's provision for arbitration and related provisions for the enforcement of an arbitration award. The high court first reiterated that to relinquish its immunity, a tribe's waiver must be "clear." (*Id.* at p. 418 [121 S.Ct. at p. 1594].) The arbitration clause in that case required resolution of all contract-related disputes between C & L and the tribe by binding arbitration, and stated that any ensuing arbitral awards could be reduced to judgment " 'in accordance with applicable law in any court having jurisdiction thereof.' " (*Id.* at pp. 418-419 [121 S.Ct. at p. 1594].) The Supreme Court based its analysis on the contract's choice-of-law clause, which made it plain that the court having jurisdiction to enforce the award in question was the Oklahoma state court in which C & L filed suit: "By selecting Oklahoma law ('the law of the place where the Project is located') to govern the contract, [citation], the parties have effectively consented to confirmation of the award 'in accordance with' the Oklahoma Uniform Arbitration Act," and the tribe thereby waived its sovereign immunity by contract.[5] The court found it significant that it was the tribe which proposed and signed the agreement, and therefore it had clearly consented to arbitration and to the enforcement of arbitral awards in Oklahoma state court, and thus waived its sovereign immunity from suit on the agreement. (*Id.* at p. 413 [121 S.Ct. at pp. 1591-1592].)

According to a treatise in the area, the *C & L* decision (*C & L, supra*, 532 U.S. 411) "stands for the general proposition that, while clarity of expression is essential to a tribe's waiver of immunity from suit, particular words of art are not." (Deskbook, *supra*, (2002 supp.), p. 68.)[6]

Recently, in *Smith, supra,* 95 Cal.App.4th 1, the court applied the rule of the *C & L* case by finding that the agreement between the plaintiff, an architect, and the tribe, was "indistinguishable from the contract in *C & L Enterprises*, and the only reasonable interpretation of its terms is that it clearly, and explicitly waives tribal sovereign immunity." (*Id.* at p. 6, italics omitted.) The contract contained an arbitration clause, and agreed to enforcement of an arbitral award, " ' "in any court having jurisdiction thereof." ' " (*Ibid.*) This amounted to a tribe's explicit contractual waiver of its sovereign immunity from suit.

---

[5]In *C & L, supra,* 532 U.S. 411, the Supreme Court declined to address an alternative argument, not timely raised or previously litigated, that the contract was void and/or the members of the Tribe who executed the contract lacked the authority to do so on the Tribe's behalf. (*Id.* at p. 423, fn. 6 [121 S.Ct. at p. 1597].) This issue is raised here, however. (See also *Smith, supra,* 95 Cal.App.4th at pp. 7-9.)

[6]In addition to relying on the *C & L* case, the Tribe in this case refers to the sovereign immunity principles developed in *College Savings Bank v. Florida Prepaid Postsecondary Ed. Expense Bd.* (1999) 527 U.S. 666, 670 [119 S.Ct. 2219, 2223, 144 L.Ed.2d 605], regarding state sovereign immunity under the Eleventh Amendment of the United States Constitution. However, there is ample case law dealing directly with Indian sovereign immunity and we do not deem it necessary to delve into this Eleventh Amendment jurisprudence at this point.

In *Smith, supra,* 95 Cal.App.4th at pages 11 through 12, the Court of Appeal analyzed *Sanderlin v. Seminole Tribe of Florida* (11th Cir. 2001) 243 F.3d 1282, 1286, as shedding light on the method of waiver issue. There, the federal court of appeals rejected an argument by the plaintiff, who was claiming disability discrimination as against an Indian tribe, that the actions of the tribal chief and chairman in accepting certain federal funds had constituted a voluntary and implicit waiver of the tribe's right to immunity from lawsuits under applicable federal legislation, the Rehabilitation Act (29 U.S.C. § 794). The court rejected both of the plaintiff's theories: that the tribal chief had actual or apparent authority to waive the tribe's sovereign immunity when he entered into contracts with the government for the tribe's receipt of federal funds, or that there was a specific waiver of the tribe's sovereign immunity from suit, through such acceptance of funds. (*Sanderlin, supra,* 243 F.3d at pp. 1288-1289.) Rather, the court found that even if the tribal chief had authority to waive sovereign immunity, which he did not, the contracts in question merely conveyed a promise not to discriminate, and did not constitute an express and unequivocal waiver of sovereign immunity or a consent to be sued in federal court on a claim such as Sanderlin's. (*Ibid.*) In *Smith, supra,* 95 Cal.App.4th 1, the court distinguished the facts of the *Sanderlin* case, in part because in that federal case, there was no showing that a person with actual authority to execute a contract on behalf of the tribe did so, or that the tribal council passed a resolution approving the contract. In *Smith, supra,* 95 Cal.App.4th at pages 11 to 12, both those factors were present.

Accordingly, in *Smith,* the court accepted the view that an otherwise binding contract was effective to waive sovereign immunity, under the applicable tribal sovereign immunity ordinance, even where the explicit waiver was made by contract, instead of pursuant to a tribal ordinance or resolution. The court's analysis depended on several factors: First, the court did not "interpret the reference in the tribal ordinance to an 'explicit' waiver to mean that a resolution must use the magic words 'waiver' or 'sovereign immunity.'" (*Smith, supra,* 95 Cal.App.4th at p. 9.) Rather, it was enough that the tribal council, with full knowledge of its terms, approved the contract by resolution, because this satisfied the purpose of the tribal sovereign immunity ordinance ("to ensure that no waiver of sovereign immunity is made by a single tribal officer, and that instead such waivers be made only by formal action of its governing body, the tribal council"). (*Ibid.*)

Second, the court in *Smith* adhered to the statement in *C & L, supra,* 532 U.S. 411, 421, footnote 3 [121 S.Ct. at page 1595], that reference to uniform federal law governing the waiver of immunities by foreign sovereigns was instructive in deciding whether a particular act constituted a waiver of tribal immunity. The Court of Appeal in *Smith, supra,* 95 Cal.App.4th 1, ruled that

federal law, not the tribal provisions, had to be applied to decide the enforceability of a contract that was negotiated and signed by a person who was authorized to do so, where the tribal council approved the contract. "Under federal law, '[w]hen a person has authority to sign an agreement on behalf of a state, it is assumed that the authority extends to a waiver of immunity contained in the agreement.' [Citation.]" (*Id.* at p. 10.)

Third, the Court of Appeal found in *Smith* that because the contract itself specified that it was governed by California law, then the tribe's sovereign immunity ordinance was not alone dispositive to decide whether the contractual waiver of immunity was effective. The court explained, "Nothing in the tribal sovereign immunity ordinance purports to limit the manner in which the Tribe may consent to a choice of law provision, and [the Tribe] does not contend [the negotiator] did not have authority to agree to it, or that the tribal council did not have the power to approve a contract containing such a provision. Therefore, at least for purposes of interpreting and enforcing this contract, respondent agreed to be governed by California law, not tribal law. Under California law '[t]he making of an agreement . . . providing for arbitration to be had within this State shall be deemed a consent of the parties thereto to the jurisdiction of the courts of this State to enforce such agreement . . . and by entering judgment on an award [hereunder].' " (*Smith, supra,* 95 Cal.App.4th at pp. 10-11.) The court thus concluded it was error to dismiss the case, because the tribe, through its authorized negotiator, and by resolution of the tribal council, had entered into and approved a contract that "clearly and explicitly waived the Tribe's sovereign immunity. (*C & L Enterprises, supra,* 532 U.S. 411.)" (*Smith, supra,* 95 Cal.App.4th at p. 12.)

Before we discuss the analysis of *Smith, supra,* 95 Cal.App.4th 1, and compare it to the facts of our own, we first briefly discuss the applicability of the rules relating to limited liability companies, such as First Nation, in this context.

C

*Relationship of the Tribe and First Nation, a Limited Liability Company*

The complaint alleges that First Nation is a Delaware limited liability corporation. California, along with 45 other states, has such a statutory scheme, in Corporations Code section 17000 et seq. (9 Witkin, Summary of Cal. Law (2002 supp.) Partnership, § 120, pp. 292-293.) ▮▮ As explained in that authority: "A limited liability company is a hybrid business entity that combines aspects of both a partnership and a corporation. It is formed under the Corporations Code and consists of 'members' who own membership interests. Members may be individuals, corporations, partnerships, or other limited liability companies. [Citation.] [¶] The company has a

legal existence separate from its members. It provides members with limited liability to the same extent enjoyed by corporate shareholders, yet allows members to actively participate in management and control."

The general rule for limited liability companies is nonliability for the individual members of the limited liability company for judgments for the debts or obligations of the company. (9 Witkin, Summary of Cal. Law, *supra,* Partnership, § 140, p. 311; Corp. Code, § 17101, subd. (a).) However, by a 1999 amendment to Corporations Code section 17101, subdivision (b), such individual liability can be imposed under rules that are comparable to shareholder liability, as follows: " 'A member of a limited liability company shall be subject to liability under the common law governing alter ego liability . . . .' " (9 Witkin, Summary of Cal. Law, *supra,* Partnership, § 140, p. 311.)

As previously noted, the allegations here are that First Nation is a tribally controlled entity that was formerly 51 percent owned by the Tribe, and as of the time of these disputes, owned 100 percent by the Tribe. The alter ego allegations are based on that relationship. We have not been provided with any references to how Delaware law may differ from California law in this respect.

### III

### *Application of Standards*

Our task is to apply all these principles to the factual and procedural context before us, to decide if the methods used in these contractual transactions could arguably constitute a clear and express waiver of the Tribe's sovereign immunity, under the Tribal Constitution as it may be interpreted according to federal case law. The applicable provision of the Tribal Constitution reads, "Sovereign immunity may be waived only by express resolution enacted by a majority vote of the Tribal Council, and only to the extent specified in such resolution. Before such resolution is enacted, the Tribal Council will seek the advice of legal counsel."

As discussed in part II.B., *ante,* this constitutional provision must be interpreted in light of federal law, and the tribal constitutional language is not self-enforcing or definitive, if other significant factors are present. (*Smith, supra,* 95 Cal.App.4th at p. 10, fn. 9; citing *Aquamar v. Del Monte Fresh Produce* (11th Cir. 1999) 179 F.3d 1279, 1294, fn. 36 (*Aquamar*).) The proper inquiry is whether a waiver of sovereign immunity was effected by one with the authority to do so. (*Smith, supra,* 95 Cal.App.4th at p. 10, fn. 9.)

In *Smith, supra,* 95 Cal.App.4th 1, the contractual waiver of sovereign immunity was held to be sufficient in light of the contract's adoption of

California law and the arbitration method of dispute resolution, in light of the negotiation of the contract by an authorized tribal representative, and approval of the contract by tribal resolution. In the case before us, the Agreement provides for the applicability of California law, and it was signed by the chairman of the Tribe, on behalf of the Tribe as a party, in the presence of five of the seven tribal council members. The Tribe conditionally agreed it would not assert tribal immunity in an action (any action?) brought by Warburton to enforce the Agreement. (I.e., "Because it may be determined . . . that First Nation is a tribally-controlled entity . . . .") However, there is language in the Agreement referring to an attachment (a tribal resolution waiving sovereign immunity in any action by Warburton against First Nation) that was stricken out, and no tribal resolution was ever enacted to approve the contract. This renders the *Smith* authority distinguishable as to the negotiation and approval factors.

However, the principles laid out in *Smith, supra,* 95 Cal.App.4th 1, may still apply, because there is another factor present here that was not present in *Smith.* Specifically, we refer to the alter ego allegations that First Nation is a tribally controlled entity that was formerly 51 percent owned by the Tribe, and at the time of these disputes, owned 100 percent by the Tribe. There are allegations of commingling of funds, lack of corporate formalities, and undercapitalization of the corporate entity. As the Tribe has acknowledged, the conditional waiver of immunity is ambiguous as to the circumstances to which it applies. These theories raise issues concerning whether the Tribe, as a member of the limited liability company First Nation, is protected from liability to the same extent enjoyed by corporate shareholders, or whether it may be held subject to individual liability under the common law of alter ego liability. (9 Witkin, Summary of Cal. Law, *supra,* Partnership, § 140, p. 311.) It is not yet clear if the Tribe, through its chairman or council, was acting in a corporate or a governmental capacity at the time of these transactions. (*Linneen, supra,* 276 F.3d at p. 493.)

To return to the petition, the narrow issue currently before us is whether Warburton is entitled to discovery to pursue the above alter ego allegations and its other theories of contractual liability and fraud, despite the admitted lack of a formal tribal resolution. We believe that Warburton is so entitled, for a number of reasons. First, as far as the procedural fairness of the summary judgment proceedings is concerned, we have grave doubts that the trial court was authorized to accelerate the summary judgment hearing date and to rule upon the issue of subject matter jurisdiction, based solely upon evidence provided by the Tribe, where there are significant disputes about the interpretation of the tribal constitutional provision. For example, in its ruling, the court relied upon evidence of other resolutions entered into by the Tribe approving other contractual arrangements, for comparison purposes. Procedural fairness considerations weigh in favor of allowing the

requested discovery, and the calendaring of the various motions should have been enforced as scheduled. (See § 437c, subd. (h).)

The trial court's findings of lack of subject matter jurisdiction are substantively flawed as well. Understandably, the trial court was cautious in venturing into an area in which tribal sovereignty operates. However, this was a discovery matter, and federal case law and California law both allow for discovery into fundamental questions of subject matter jurisdiction, in order that the court may be satisfied of its authority to act in a particular dispute. (*Great Western Casinos, supra,* 74 Cal.App.4th 1407, 1418.) Merely because there is no waiver of immunity in the form of a written tribal resolution does not mean that no state law discovery on the waiver issue, i.e., if any waiver was permissibly accomplished through contract, may be ordered.

Next, the trial court could not justifiably assume that the language of the Tribal Constitution must always be literally enforced, so that only a written tribal resolution could satisfy the requirement that only an express waiver occur. Federal law applies, and the recent cases in this area have enforced contractual waivers of sovereign immunity, where they were executed by persons authorized to do so and where the necessary formalities were adequately observed. (*C & L, supra,* 532 U.S. 411, 423 [121 S.Ct. 1589, 1596-1597].) No magic words are required, and the waiver of sovereign immunity need not mention those particular terms. (*Smith, supra,* 95 Cal.App.4th at p. 9.) This was not a case in which an individual entered into a contract without the knowledge of the tribal council who actually had the power to contract. (*Sanderlin v. Seminole Tribe of Florida, supra,* 243 F.3d at pp. 1288-1289.) Instead, these transactions took place with five of the seven tribal councilors present and participating, even if they were not designated to be sitting as a tribal council at that time and in that particular chamber. It cannot be determined at this point whether a waiver of sovereign immunity was effected by a person or body with the authority to do so. (*Aquamar, supra,* 179 F.3d at p. 1294.) The conditional waiver of immunity was ambiguous in nature. Further, the record does not currently indicate what formalities are required by the Tribal Constitution for calling a noticed meeting of the tribal council and whether such notice could be waived by the participants, if sufficient in number. We do not believe these circumstances are currently subject to resolution of immunity questions as matters of law.

Moreover, none of the cases cited and reviewed that have found contractual waivers of sovereign immunity, that were ultimately approved by official tribal resolutions of some variety, also contained the type of alter ego allegations that we have here. (*Smith, supra,* 95 Cal.App.4th at p. 10.) Under all the circumstances, we believe that at the very least, these allegations and

the circumstances of the parties' entry into the Agreement justify discovery into the claims of estoppel, ratification by performance of the Agreement, and the relationship between the Tribe and First Nation, both of whom are named parties to the Agreement. The Agreement provides at paragraph 7.1 that California law governs its provisions, and California law follows an objective theory of contract. The parties' subjective intent in entering into the contract is not determinative; rather, there may be factual questions subject to resolution concerning the circumstances of the entry into and performance of the agreement, as shown by extrinsic evidence. (*Brant v. California Dairies, supra,* 4 Cal.2d 128, 133; *Morey v. Vannucci, supra,* 64 Cal.App.4th 904, 913.)  Facts that are normally within the knowledge of corporate, or in this case, tribal, officers, relating to jurisdictional issues, are ordinarily subject to discovery. (*1880 Corp. v. Superior Court, supra,* 57 Cal.2d 840, 843.)  Just as in *Smith, supra,* 95 Cal.App.4th 1, the language in the Agreement providing it was entered into and governed by the internal laws of the State of California, with venue for any disputes to be in San Diego, California, may be subject to the interpretation that the Tribe thereby agreed to enforcement of the Agreement in the California courts, and this may have constituted an explicit contractual waiver of its sovereign immunity from suit, if the discovery supports such a view.

We are aware that the first half of the discovery propounded by Warburton clearly relates to the subject matter jurisdiction issues (regarding the circumstances of the signing of the Agreement, and requests for admissions or production of documents such as resolutions, ordinances, or delegations of authority to waive sovereign immunity). In addition, Warburton served a second series of requests, understood by both parties to go more to the merits of the dispute, about the circumstances and events related to the negotiation and performance of the Agreement, and any documents supporting the affirmative defenses pled in the Tribe's answer. However, both sets of requests deal with very similar issues. This case has already been delayed in its resolution due to the pendency of these writ proceedings, and we are reluctant to enforce further delay by making a bright line distinction between the two portions of discovery. Even during subject matter jurisdiction disputes, the trial courts have the power to make interim orders and provide for the progress of the case pending resolution of the jurisdictional questions. (*Great Western Casinos, supra,* 74 Cal.App.4th at pp. 1418-1419, fn. 2.)

However, in an abundance of caution, at this point, we grant the petition with directions, first, to allow the portion of the requested discovery regarding subject matter jurisdiction to proceed, and second, to allow the Tribe to renotice its motion for summary judgment on the jurisdictional question, if it wishes to do so. Depending upon the outcome of those proceedings, the trial court must forthwith determine if the related discovery on the merits of the

allegations must also be permitted and reschedule the trial date accordingly. The Tribe's motion to dismiss in this court is denied.

## DISPOSITION

Let a writ of mandate issue directing the Superior Court of the County of San Diego to vacate its order of May 16, 2002 denying the discovery motions and making findings about a lack of subject matter jurisdiction, and to enter a new order allowing the requested discovery regarding subject matter jurisdiction to proceed, and allowing the Tribe to renotice its motion for summary judgment on the jurisdictional question, if it wishes to do so. Thereafter, the trial court is directed to hold appropriate proceedings forthwith to determine if the related discovery on the merits of the allegations must also be permitted and if the trial date must be rescheduled. Warburton/Buttner is awarded costs in these writ proceedings.

Benke, Acting P. J., and McConnell, J., concurred.

A petition for a rehearing was denied December 19, 2002.